## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

In re

**EDRA D BLIXSETH**,

Debtor.

Case No. **09-60452-7**

**RICHARD SAMSON** and **ROSS P RICHARDSON**,

Plaintiffs.

-vs-

**CINCINNATI INSURANCE COMPANY**,

Defendant.

Adv No. **11-00014**

## MEMORANDUM of DECISION

At Butte in said District this 12ᵗʰ day of March, 2012.

In this Adversary Proceeding, after due notice, trial was held December 1 and 2, 2011, in

Butte and on December 12, 2011, in Missoula.  Plaintiff Richard Samson ("Samson") was

represented at trial by David B. Cotner ("Cotner") and Joslin E. Monahan of Missoula, Montana;

Plaintiff Ross P. Richardson ("Richardson") was represented at trial by Ford Elsaesser of

Sandpoint, Idaho; and Defendant Cincinnati Insurance Company ("Cincinnati" or "CIC") was

represented at trial by Nancy K. Tordai of South Barrington, Illinois and Eric E. Nord of Billings,

Montana.  In addition to the issues asserted in the Pretrial Order filed November 18, 2011, there

is also pending in this Adversary Proceeding Cincinnati's Motion in Limine to Preclude

1

Evidence of Attorneys' Fees Damages filed November 1, 2011, at docket entry no. 112, Cincinnati's Motion in Limine to Preclude Evidence Relating to Estoppel filed November 1, 2011, at docket entry no. 113, and Cincinnati's Motion for Partial Summary Judgment filed November 1, 2011, at docket entry no. 115.  Prior to trial, the Court denied the parties' competing motions for summary judgment and also denied various motions in limine.  In Orders entered November 30, 2011, the Court granted requests for judicial notice filed by the Plaintiffs and Cincinnati.

During the Plaintiffs' case-in-chief, the Court heard testimony from: (1) Stephan Garden, the financial consultant to Richardson, the Chapter 7 trustee of the Yellowstone Club World estate.  Garden also sat as an alternate advisory member of the Yellowstone Club Liquidating Trust board; (2) Debtor Edra Blixseth ("Debtor"); (3) Richardson's counsel John Amsden ("Amsden"); (4) Cincinnati's counsel Victor Peters ("Peters"); (5) attorney James Murray; (6) attorney Michael Black; (7) Samson, the Chapter 7 Trustee appointed in Debtor's bankruptcy case; and (8) Richardson.  Following Plaintiffs' case-in-chief, Cincinnati called Peters, Constance Hennigan and Robert Phillips.  During rebuttal, Plaintiffs again called Amsden.  A record of the exhibits admitted into evidence can be found in the Court's records at docket entry no. 185.  At the conclusion of trial on December 12, 2011, the Court granted the parties through December 30, 2011, to submit proposed findings of fact and conclusions of law.  Upon request of the parties, the Court extended the deadline for filing proposed findings of fact and conclusions of law to January 6, 2012.  The Plaintiffs and Cincinnati filed proposed findings of fact and conclusions of law on January 6, 2012.  Supplements and responses filed after the January 6, 2012, deadline were not considered by the Court.

2

Jurisdiction over this adversary proceeding is based on 28 U.S.C. §§ 157(a) and (c) because this proceeding is related to a case under Title 11.  Venue in this case is proper pursuant to 28 U.S.C. § 1409(a).  Plaintiffs further contend that 28 U.S.C. § 1334, Bankruptcy Rule 7001, and 11 U.S.C. §§ 510(c), 544(b), 548, 550 and 105(a), confer jurisdiction and that this is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(A), (G), and (O).  At trial, all parties consented to this Court issuing a final judgment on the claims asserted. This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

## BACKGROUND

Debtor and her former spouse, Timothy L. Blixseth ("Blixseth") were the founders of a complicated web of corporations, real estate holdings and operating companies, including Yellowstone Mountain Club, LLC ("YMC"), Yellowstone Development, LLC ("YD"), Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC (collectively the "Yellowstone Club entities").  Through the Yellowstone Club entities, Blixseth and Debtor began development in the late 1990's of the Yellowstone Club on land that Blixseth acquired through various transactions.  The Yellowstone Club was, and still is, an ultra-exclusive, members only master-planned development that has been touted as the World's only private ski and golf community.

From its inception to August 12, 2008, Blixseth was the sole managing member of Big Sky Ridge, LLC.  From their inception to August 12, 2008, YMC and YD were controlled by Blixseth through his holding company, Blixseth Group, Inc. ("BGI").  Yellowstone Club Construction Company, LLC was formed in 2006 and was owned by YD.

In September of 2005, BGI owned 82.6532 percent of the Class A stock in YMC and YD. The remaining 17.3468 percent ownership interest in YMC and YD was held by Blixseth Family

3

Investments, LLC[1] and the Class B Shareholders.  The Class B Shareholders consisted of the following twelve entities or individuals: Bankers Financial Corporation, Gregory C. Branch Family Limited Partnership, Blixseth Family Investments, LLC, Jorge V. Jasson, Greg LeMond, A.C. Markkula and Linda K. Markkula Trustees of the Arlin Trust, Mountain Vista Properties AG, David L. Morris and Sacia B. Morris, Sacia Enterprises, Inc., Michael L. Snow, Spano Yellowstone Holdings Limited Partnership and Robert P. Watson and Katharine M. Watson. The Class B Shareholders each owned 1.0204 percent of YMC and YD.  In total, the Class B Shareholders owned 12.25 percent of YMC and YD.

In September of 2005, Blixseth, on behalf of YMC, YD and Big Sky Ridge, LLC entered into a $375 million First Lien Credit Agreement ("Credit Agreement") with Credit Suisse, Cayman Islands Branch ("Credit Suisse").  The Credit Suisse Credit Agreement provided YMC, YD and Big Sky Ridge, LLC with a $375 million Senior First Lien Credit Facility that was funded in its entirety on September 30, 2005.

Prior to securing the loan from Credit Suisse and in an attempt to eliminate the issues attendant to the Class B Shareholders, Blixseth, during the spring and summer of 2005, sought to buy the interests of the Class B Shareholders.  Not all Class B Shareholders were receptive to Blixseth's offer of purchase and Blixseth ultimately purchased none of the Class B Shareholders' interests because the offer was an all or nothing deal.

Because Blixseth was not able to purchase the stock of the Class B Shareholders, Blixseth

---

[1]  Since late 2007/early 2008, Debtor owned a 60% interest in Blixseth Family Investments, LLC, Debtor's two children each owned a 10% interest in Blixseth Family Investments, LLC, and Blixseth's two children each owned a 10% interest in Blixseth Family Investments, LLC.

successfully negotiated with Credit Suisse for modification of the loan documents to provide that

$209 million of the Credit Suisse loan proceeds could be used for either distributions or loans to

members of YMC and YD for purposes unrelated to the Yellowstone Club.[2]  As a result of

Blixseth's negotiations with Credit Suisse, YMC, YD and Big Sky Ridge, LLC could use the

proceeds of the Credit Suisse Credit Agreement in two significant ways.  First, the Credit

Agreement provided that up to $209 million of the loan proceeds could be used as "distributions

or loans" for "purposes unrelated" to the Yellowstone Club.  Additionally, YMC, YD and Big

Sky Ridge, LLC could use up to $142 million of the loan proceeds for investments in

"unrestricted subsidiaries" for "purposes unrelated" to Yellowstone Club development.  Upon

securing the Credit Suisse loan proceeds on September 30, 2005, Blixseth transferred $209

million to BGI and the remainder of approximately $133,110,262.53 stayed with YMC.

During the time Blixseth was negotiating with Credit Suisse, Blixseth was also working

on a plan to take the Yellowstone Club concept worldwide.  Blixseth's new concept came to be

known as Yellowstone Club World.  To facilitate his vision, Blixseth formed Yellowstone Club

World, LLC ("YCW") and on October 1, 2005, in his capacity as President of YD, YMC and

BGI and as Manager of Big Sky Ridge, LLC and YCW, executed a "Five-Party Agreement."

The Five-Party Agreement that reads in part:

> [YCW] will enter into a standard access agreement with [YMC, YD and Big Sky
> Ridge, LLC] to provide use of the Resort Property by the members of [YCW].
>
> 4.    Option.  In connection with each Resort Property acquired by
> Yellowstone, it shall grant to YCW an option to acquire such Resort Property
> ("Option").  The Option price shall be the acquisition price of the Resort Property

---

[2]  The loan documents originally provided that the Credit Suisse loan proceeds could be used only for distributions.

paid by Yellowstone, plus 10% per annum of such acquisition price, together with 0all of the transaction costs incurred by Yellowstone in acquiring the Resort Property.  The Option shall have a term of ten (10) years from the date the Resort Property is acquired by Yellowstone.

Resort Property was defined in the Agreement as follows: "As allowed by the Yellowstone/CSFB credit facility, Yellowstone will invest in one or more resort locations identified by YCW as properties it wishes to acquire ('Resort Property').  Yellowstone will acquire the Resort Property identified by YCW up to the sum of $142,000,000, inclusive of acquisition and transaction costs and fees.  The Resort Property will either be owned by Yellowstone directly or by a wholly owned subsidiary of Yellowstone."

As explained by Stephan Garden:

[T]he Yellowstone Club World concept . . . was an expansion of the mountain club. One of the key things was that the membership deposits, which were refundable membership deposits, the way the business was initially thought out . . . -- these membership deposits were supposed to be held in trust.  And the Yellowstone Club World, not owning of the properties but having those properties available to its members, was supposed to be more of the operational and marketing arm of it. And what I mean by that is Yellowstone Club World was supposed to maintain the properties, market them to its members, set up events, have a reservation system through which the members could book the various properties.

But what's important with that is that the way the funding for Yellowstone Club World was supposed to come was through the interest that would be earned on these membership deposits that were supposed to be held in trust account. The initial business plan or concept for Yellowstone Club World called for about 100 members.  And if you do the quick math, you know, 100 members at $3 million is $300 million on which you could easily earn enough interest to basically maintain and operate these various properties. Unfortunately, that number of members was never reached.  I think the high point of Yellowstone Club World was eight full members actually joined.  And some of the membership deposits were actually used to finance the Yellowstone Club World operations and to finance the various properties that Yellowstone Club World had access to.

High-wealth individuals who purchased memberships in Yellowstone Club World were

6

promised "access to life's most luxurious amenities, activities and services," and "premier properties," including Debtor and Blixseth's private golf course estate in Rancho Mirage, California (Porcupine Creek), and a luxury ranch near Cody, Wyoming.[3]  The use of various yachts and private jets, and access to "[s]mall scale world class properties in exquisite locations" were also held out as benefits to members of Yellowstone Club World.  Consistent with Garden's testimony, eight individuals paid a membership deposit of $1.5 million each to become members of Yellowstone Club World.

After securing the Credit Suisse loan proceeds, Blixseth, in March of 2006, purchased: (1) the Chateau de Farcheville in France for $24 million ($16 million was assigned to the ancient medieval castle and $8 million was assigned to the various antiques in the castle); (2) a golf

---

[3]  A document titled "Yellowstone Club Fact Sheet" states that members of YCW would have access to:

1.  Big Sky, Montana - Yellowstone Club, the world's only private ski and golf community.
2.  Paris, France - 800 year old estate, built in 1290, exquisite decor and luxury on 1,200 acres.
3.  Turks & Caicos - 30,000 square foot mansion at the center of their own tropical resort island.
4.  Manzanillo, Mexico - Tamarindo Golf course, your own Beach and over 2000 acres of privacy.
5.  Palm Springs, CA - Estate and cottage homes amidst 647 acres and private member golf course.
6.  Kingdom of Fife - Private Golf course at St. Andrews, Scotland, designed by Tom Weiskopf.
7.  Cody, Wyoming - Buffalo Bill, Old West themed property with golf and outdoor activities.
8.  Yacht/Planes - Members will enjoy the "Tooth Fairy", "Piano Bar", Planes for YCW location access.
9.  Tahiti - (under negotiation) Premier Polynesian Island with over the water bungalows and water sports.
10.  Hush Properties - Small scale world class properties in exquisite locations.

resort property in Manzanillo, Mexico, often referred to as Tamarindo, for $40 million; (3) a private island in the Turks and Caicos which included a 30,000 square foot mansion[4], for $28 million; and (4) a property located in the Kingdom of Fife, Scotland, commonly referred to as the St. Andrews Property, by making a down payment of $12 million.[5]

The Class B shareholders learned of the Credit Suisse loan sometime after September 30, 2005. In May 2006, Class B Shareholders Greg LeMond, Jorge V. Jasson, David L. Morris, Sacia B. Morris, and Sacia Enterprises, Inc., threatened suit against Blixseth. After receiving the threat from the foregoing shareholders, Blixseth took steps to characterize the money he transferred from YMC and YD to BGI as loans. To that end, Blixseth caused promissory notes totaling $272,598,796.68 to be drafted in favor of the Yellowstone Club entities. The unsecured demand notes, payable by BGI to the Yellowstone Club entities, although drafted in May 2006, were dated September 30, 2005. Because a substantial portion of the money at issue had ultimately been used by Blixseth personally, Blixseth's in-house counsel, in 2007, drafted notes to evidence BGI's transfer of funds to Blixseth.

On May 31, 2006, Greg LeMond, Jorge V. Jasson, David L. Morris, Sacia B. Morris, and Sacia Enterprises, Inc. (collectively the "LeMond Plaintiffs"), filed a complaint in Madison

---

[4] Edra testified that "[t]he Turks and Caicos property was supposed to be one of the YCW locations, but it had always been in Tim's name. . . To clarify, it's been stated that the money came from the Credit Suisse money and then through YDI. That's not accurate. There was certain money that was in YDI that things were purchased for. There was certain money that was taken immediately from the Credit Suisse loan and put through BGI and then into Tim's personal name, and that's how the Turks and Caicos was paid for and that's why it's not part of this."

[5] The total purchase price of the St. Andrews property, exclusive of development costs, was supposed to be around $30 million. The St. Andrews property was sheep pasture that Blixseth hoped to develop into a golf course.

8

County, Montana, captioned *LeMond v. Blixseth Group, Inc.*, C.V. No. DV-29-06-26 (the "LeMond Litigation"). In general, the LeMond Plaintiffs complained that the $209 million Blixseth took from the Debtors in September of 2005 was a distribution, not a loan. The LeMond Plaintiffs argued they were entitled to their pro rata share of the distribution under YMC and YD's applicable operating agreements. Blixseth, on behalf of himself, YMC and YD, settled the above-referenced litigation sometime prior to August 12, 2008, for $38 million.

Debtor filed for divorce in the Riverside Superior Court in December 2006, *In re Marriage of Blixseth*, Riverside [California] Superior Court Case No. RIDINDO91152. Blixseth and Debtor's divorce was acrimonious and between the time Debtor filed for divorce in December 2006, and August 12, 2008, Debtor had no involvement in the affairs of the Yellowstone Club entities or Yellowstone Club World. Blixseth and Debtor eventually entered into a Marital Settlement Agreement ("MSA") in June of 2008. The MSA consists of 42 pages plus exhibits. The MSA was supplemented by an Amendment to Marital Settlement Agreement dated July 2, 2008, consisting of 4 pages, and was again supplemented by a Second Amendment to Marital Settlement Agreement dated August 12, 2008, consisting of 7 pages plus exhibits and certain side letters.

As part of the MSA, Debtor received, on or about August 12, 2008, Yellowstone Club World, LLC and BGI, including its ownership interest the Yellowstone Club entities. When Debtor took over control of Yellowstone Club World, LLC in August of 2008, YCW had no cash, no employees, no active operations, no business purpose and, to the best of Debtor's knowledge, no officers. In conjunction with executing the MSA, Debtor and Blixseth also executed a document titled "Written Consent of The Members of Yellowstone Club World, LLC

a Washington limited liability company August 20, 2008" in which Blixseth resigned as manager of YCW and Debtor was appointed manager. Debtor had no knowledge of the Five-Party Agreement until Richardson filed an action against Debtor in 2009.

When Debtor received control of the Yellowstone Club entities in August of 2008, YD was, through various entities, the owner of the Chateau de Farcheville and St. Andrews properties.[6] Blixseth received, through the MSA, the Tamarindo Resort and the Turks and

---

[6] At the time Debtor and Blixseth executed the MSA, the Chateau de Farcheville in France was owned by Danika Investment, Ltd., an Irish entity. In turn, Danika was owned by Cosborn Investments, a Dutch entity, which in turn was owned by Jaroup BV, another Dutch entity. YD held a 100 percent ownership interest in Jaroup Investments. Both Cosburn and Jaroup were monitored and managed by persons referred to by Stephan Garden as "professional trustees." Garden explained that the professional trustees were basically independent directors who worked at that time for an entity called "Fortis Intertrust." According to Garden, "[e]ven though the ultimate owner was Yellowstone Development, there were certain independent directors and representatives at all of these different country levels in France, in Ireland, in the Netherlands that were independent and had certain fiduciary obligations." Similarly, the St. Andrews property was owned by St. Andrews Golf Club International, a Scottish entity, which in turn was owned by YD. Stephan Garden explained that many foreign countries, such as France and Scotland require the appointment of an independent director to oversee properties owned by foreign persons. Such directors are independent, have personal liability for their actions and owe fiduciary obligations to various people, including the employees at the properties. Because of the independent fiduciary obligations, Frida Peters, the director overseeing the Chateau de Farcheville made the decision to put Chateau de Farcheville into the equivalent of a French bankruptcy because under French law, she had to insure employees were being paid and treated fairly. Frida Peters made such decision because French governmental agencies were threatening to put Frida Peters in jail after learning that employees at the Chateau de Farcheville were not being paid, and that the electricity had been turned off. Chateau de Farcheville was put into a "observation period" in May of 2009, which later became a liquidation proceeding in approximately July of 2009.

In discussing the ownership of the Chateau de Farcheville through Danika, Cosborn and Jaroup, Garden testified:

A.      But what's important, I think, about these transfers is: Every time these transfers occurred, there's opportunities to basically perfect and record the options and the right of use. And from my investigation, that was never done.

10

Caicos property.  Immediately after August 12, 2008, Debtor changed the name of BGI to BLX Group, Inc. ("BLX").  However, debtor did not make any changes to the ownership structure of either the Chateau de Farcheville or St. Andrews.

On January 31, 2008, while YMC and YD were under the sole control of Blixseth, Cincinnati issued Blue Chip Policy No. BCP 8779827 to YMC and its subsidiaries, and by a General Change Endorsement effective January 31, 2008, to YD, for the policy period from January 31, 2008, through January 31, 2009 ("the Policy").  The Policy provides "Directors and Officers Liability and Company Coverage" on a "claims made" basis.  Relevant portions of the Policy are as follows:

PART I
DIRECTORS AND OFFICERS LIABILITY AND COMPANY COVERAGE

SECTION I - INSURING AGREEMENTS

A.     We will pay on behalf of the "directors and officers" all "loss" which they shall be legally obligated to pay, except for such "loss" which the "company" actually pays as indemnification, resulting from any "claim" first made during the "policy period", or any "extended reporting period"

---

Q. At the time the transfer was made from Yellowstone Development to these three entities that you've described --

A. Yes.

Garden testified that YD tried unsuccessfully to sell the Chateau de Farcheville during the summer of 2008, to a Russian investor for approximately $60 million.  According to Garden, "[t]hat offer, for whatever reason -- you know, the actual close of the transaction didn't happen, and I think that had a tremendous impact on the subsequent events with the Yellowstone Mountain Club."  All parties agree that had the sale closed, none of the proceeds would have gone to YCW.

As for the St. Andrews property, Garden testified that "[t]he party to that consulting agreement had already received a default judgment in Scotland" in early 2009.

11

included in or endorsed to the policy, for a "wrongful act".

* * *

We will have the right and duty to defend the "insureds" against any such "claim".

* * *

SECTION IV - DEFINITIONS

* * *

B.     "Company" means the "insured entity" and any subsidiary".

C.     "Directors and officers' means:

    1.     All persons who were, now are, or shall be directors or officers of the "company"; and

    2.     The lawful spouse of a director or officer, but only to the extend such person is a party to any "claim" solely in such person's capacity as a spouse of a director or officer of the "company" and only if the "claim" seeks damages recoverable from marital community property, property jointly held by the director or officer and the spouse, or property transferred from the director or officer to the spouse,

including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

D.     "Insureds" means the "company" and the "directors and officers".

* * *

H.     "Wrongful act" means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted on or after the Retroactive Date, if any, set forth in the Part I Declarations and prior to the end of the "policy period" by:

    1.     Any of the "directors and officers" in the discharge of their duties solely in their capacity as a director or officer of the "company"; or

* * *

12

2.     The "company".

***

PART IV
GENERAL PROVISIONS APPLICABLE TO ALL COVERAGE
PARTS FORMING THIS POLICY

* * *

SECTION II - LIMITS OF INSURANCE, DEDUCTIBLES, MULTIPLE
CLAIMS AND EXHAUSTION

* * *

E.     Regardless of the number of policies or Coverage Parts involved, all "claims" based upon or arising out of the same "wrongful act" or any "interrelated wrongful acts" shall be considered a single "claim".  Each "claim" shall be deemed to be first made at the earliest of the following times:

1.     When notice of the earliest "claim" arising out of such "wrongful act" or "interrelated wrongful acts" is received in writing by a "policy insured" or by us, whichever comes first; or

2.     When notice pursuant to Section V of the General Provisions of a "wrongful act" giving rise to such "claim" is given.

F.     In the event that more than one of the "policy insureds" is included in the same "claim", the total amount of "loss" resulting from such "claim" and the Deductible shall be apportioned pro-rata among the "policy insureds" in proportion to their respective "loss" unless otherwise mutually agreed upon by the "policy insureds" and us.

SECTION III - DUTIES OF THE POLICY INSUREDS IN THE EVENT OF A
CLAIM

As a condition precedent to coverage under this policy:

A.     The "policy insureds" shall give us written notice of any "claim" made against any of the "policy insureds" for a "wrongful act" as soon as practicable, and shall give such information and cooperation as we may reasonably require, including but not limited to a description of the

13

"claim", the nature of the alleged "wrongful act", the nature of the alleged injury, the names of the claimants, and the manner in which the "policy insureds" first became aware of the "claim".  As soon as practicable, the "policy insureds" shall furnish us with copies of reports, investigations, pleadings and other papers in connection with the "claim"[.]

\* \* \*

SECTION V - NOTICE OF WRONGFUL ACT

If prior to the end of the "policy period" of the applicable Coverage Part, any of the "policy insureds" first become aware of a specific "wrongful act" they believe is likely to give rise to a "claim", and if any of the "policy insureds" give us written notice as soon as practicable, but prior to the end of the "policy period" of the applicable Coverage Part, of:

A.      The specific "wrongful act"; and

B.      The injury or damage which has or may result therefrom; and

C.      The circumstances by which the "policy insureds" first became aware thereof,

then any "claim" subsequently made arising out of such "wrongful act" shall be deemed to have been made when notice of the "wrongful act" was first given.

\* \* \*

SECTION XVIII - EXTENDED REPORTING PERIOD

\* \* \*

D.      A 60-day Basic Extended Reporting Period is automatically provided without additional charge.  The Basic Extended Reporting Period starts immediately after the end of the "policy period" of the applicable Coverage Part.

The Basic Extended Reporting Period does not reinstate or increase the Limits of Insurance of the applicable Coverage Part.  Our total liability shall not exceed the Limit of Insurance shown in the applicable Declarations for the last consecutive annual period of less than 12 months in which coverage is provided hereunder.

14

* * *

SECTION XX - DEFINITIONS

Where set forth in quotes in this policy, whether in singular or in plural, the following terms shall have the meanings indicated.  Any other terms set forth in quotes in the General Provisions will have the meanings indicated in the applicable Coverage Parts.

* * *

C.      "Insured Entity" means with respect to the coverage under a particular Coverage Part, the entity names in Item 1. of the respective Declarations for such Coverage Part.

D.      "Interrelated wrongful acts" means all causally connected "wrongful acts".

E.      "Named Insured" means the entity names in Item 1. of the General Declarations.

F.      "Policy Insureds" means the natural persons and entities insured under each respective Coverage Part for which coverage is set forth in the Declarations for the policy, but shall not include any current or past partnership, joint venture or limited liability company unless such partnership, joint venture or limited liability company is shown as an "insured entity" in the Declarations of the applicable Coverage Part.

The Policy is accompanied by a Blue Chip Broadening Endorsement, which provides in

relevant part:

PART I - DIRECTORS AND OFFICERS LIABILITY AND COMPANY

COVERAGE

### *Bankruptcy Trustee Exception to the Insured vs. Insured Exclusion*

Section II - Exclusions, B. is hereby amended to include the following:

3.      Any "claim" brought or maintained by any of the "insureds" or any entity under common control with the "company" for contribution or indemnity, if such "claim" is brought by any bankruptcy trustee or former Director or Officer who has left their position for more

15

than four years.

* * *

*Order of Payments*

SECTION III - LIMIT OF INSURANCE AND DEDUCTIBLES is hereby amended to add the following:

E.  If covered "loss" on account of one or more "claims" exceeds the remaining applicable limit of insurance under this coverage section, then the unpaid portion of such "loss" covered under Insuring Agreement I.A. shall be paid by us first and then unpaid portion of such "loss" covered under Insuring Agreement I.B. and I.C. shall thereafter be paid by us only if and to the extent the applicable "limit of liability" remains unexhausted.

* * *

Broadened Definition of "Claim" (D&O)

SECTION IV - DEFINITIONS, A. is deleted in its entirety and replaces with the following:

A.  "Claim" means:

1.  any proceeding initiated against any of the "insureds" before any governmental body which is legally authorized to render an enforceable judgment or order for money damages or other relief, including any appeal from such proceeding, or

2.  a civil, administrative, or regulatory investigation, or

3.  a written demand for monetary damages or other relief.

On November 11, 2008, Debtor caused the Yellowstone Club entities, including YMC and YD, to seek protection under Chapter 11 of the Bankruptcy Code.[7] On January 30, 2009,

_____

[7]  Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."   The

Matthew Sekits ("Sekits"), counsel for YMC, sent a letter to Cincinnati which stated:

> This firm represents Yellowstone Mountain Club, LLC, which recently filed for bankruptcy protection. Yellowstone was issued policy no. BCP 8779827 by The Cincinnati Insurance Co.  On behalf of Yellowstone, we write to notify Cincinnati that, pursuant to Section V of this policy, Yellowstone has become aware of "wrongful acts" that are likely to give rise to a "claim" to which the Cincinnati policy applies.
>
> More specifically, Yellowstone has become aware of transfers of assets to persons and/or entities outside Yellowstone without proper authorization or in violation of applicable law. These unauthorized transfers could result in injury and damage to Yellowstone's creditors. Yellowstone first became aware of these unauthorized transfers after it filed for bankruptcy, while it was reviewing its internal financial documents.
>
> With this letter, Yellowstone formally tenders to Cincinnati its defense against, and indemnity for, any and all claims that may arise out of the wrongful acts discussed above under all potentially applicable policies, including policy no. BCP 8779827. Yellowstone respectfully requests a written response to this tender as soon as possible.

On that same day, January 30, 2009, Sekits sent Cincinnati a second letter.  The second

letter was identical to the first letter, except that the third paragraph set forth above was amended

to read:

> By separate letter of today's date, Yellowstone formally tendered to Cincinnati its defense against, and indemnity for, any and all claims that may arise out of the wrongful acts discussed above. That letter should provide sufficient notice with respect to all insureds under all potentially applicable policies. Nevertheless, with this letter, Yellowstone formally tenders to Cincinnati the defense against, and indemnity for any and all claims against all other insureds, including all individual directors, officers, and employees of Yellowstone, under all potentially applicable policies, including policy no. BCP 8779827. Yellowstone respectfully requests a written response to this tender as soon as possible.

Cincinnati, through its attorney Victor C. Peters of the law firm of Hanson Peters Nye,

---

Montana Code Annotated is referred to as "MCA."

responded on March 5, 2009, to Sekits' January 30, 2009, letter.  In his letter of March 5, 2009,

Peters wrote:

> [Y]ou identified unspecified unauthorized transfers of assets to third parties that
> Yellowstone Mountain Club ("Yellowstone") became aware of during the review
> of internal financial documents after filing for bankruptcy.  The letter states that
> these unauthorized transfers could potentially result in losses to Yellowstone's
> bankruptcy creditors.  All further correspondence concerning the notice of
> "wrongful acts" or any "claim" that may arise out of the notified "wrongful acts"
> can be sent directly to my attention.
>
> * * *
>
> Pending notification of an actual "claim" against the "policy insureds,"
> Cincinnati shall handle the notice material you have provided under a general
> reservation of rights.  In the event that a "claim" is actually made against the
> Policy, Cincinnati will provide a full coverage opinion.

The Yellowstone Club entities' Third Amended Joint Plan of Reorganization was

confirmed on June 2, 2009.  The Yellowstone Club Liquidating Trust ("YCLT") was created

pursuant to the Yellowstone Club entities' confirmed plan.

An involuntary Chapter 7 bankruptcy petition was filed against Yellowstone Club World,

LLC on January 25, 2009.  Ross P. Richardson of Butte, Montana was appointed the Chapter 7

Trustee in the Yellowstone Club World, LLC bankruptcy on February 18, 2009.  Richardson

filed an ex parte motion on March 4, 2009, requesting authorization to record the Five-Party

Agreement in Turks and Caicos and in Mexico.  Richardson's ex parte motion was granted

March 5, 2009.  Richardson sought to employ John Amsden as counsel for the estate on March

19, 2009.  The Court approved Richardson's request on March 20, 2009.  Prior to that date, on

January 26, 2009, Amsden and Ford Elsaesser, as co-counsel for Yellowstone Club World, LLC,

filed a Request for Special Notice in YMC's bankruptcy case.

Debtor subsequently sought protection under Chapter 11 of the Bankruptcy Code on March 26, 2009. Debtor listed herself as self-employed and disclosed that she had received no income during the 6 months prior to March 26, 2009.[8] Debtor's case was converted to Chapter 7 of the Bankruptcy Code on May 29, 2009, and Richard J. Samson of Missoula, Montana was appointed the Chapter 7 Trustee on that same date. Samson filed an application on October 2, 2009, seeking to employ David B. Cotner and the law firm of Datsopoulos, MacDonald & Lind, P.C., as attorneys for Trustee Nunc Pro Tunc. Samson's application to employ was granted November 13, 2009. Finally, an involuntary Chapter 11 bankruptcy petition was filed against BLX on September 21, 2009.

In connection with the bankruptcy of the Yellowstone Club entities, Class B Shareholders Michael L Snow, Gregory C. Branch Family Limited Partnership, A.C. and Linda K. Markkula, Spano Yellowstone Holdings Limited Partnership, Robert P. and Katharine M. Watson , Bankers Financial Corporation, and Mountain Vista Properties AG (collectively the "Snow Plaintiffs") commenced Adversary Proceeding No. 09-00018 against Blixseth, Debtor and BLX on March 3, 2009, seeking their pro rata share, as shareholders in certain Yellowstone Club entities, of the various distributions made by the Yellowstone Club entities to BGI following receipt of the Credit Suisse loan proceeds. More to the point, the Snow Plaintiffs averred they were entitled to their pro rata share of the $209 million distribution from the Yellowstone Club entities to BGI, their pro rata share of the $108 million used to purchase properties earmarked for use by the Yellowstone Club World members, and their pro rata share of an additional $64.5 million in

---

[8] In responses to requests for admission in lieu of Rule 2004 examination, Debtor admitted on or about December 30, 2010, that she was an officer, director and/or managing agent of YCW from at least August 20, 2008, to January 31, 2009.

alleged distributions from the Yellowstone Club entities to BGI.  The claims in Adversary

Proceeding No. 09-00018 are remarkably similar to the claims previously asserted by the

LeMond Plaintiffs, which claims Blixseth settled for $38 million.

Upon learning of the Snow Plaintiffs' complaint in Adversary Proceeding 09-00018, and

given other developments associated with the Yellowstone Club entities' bankruptcy cases,

Sekits sent Peters another letter on March 9, 2009, advising:

> Yellowstone has now received notice of claims against Cincinnati's insureds
> under policy no. BCP 8779827, with respect to the above-referenced matters.  A
> copy of the Complaint filed by Michael Snow and others against BLX Group,
> Inc., Timothy Blixseth, and Edra Blixseth is enclosed behind Tab 1 [Adversary
> Proceeding No. 09-00018].  In addition, enclosed behind Tab 2 is a copy of the
> Complaint filed by the Unsecured Creditors Committee against BLX Group and
> Edra Blixseth [Adversary Proceeding No. 09-00010].  Finally, enclosed behind
> Tab 3 is a copy of the Complaint approved by the Court for filing by the
> Unsecured Creditors Committee against Credit Suisse, which includes allegations
> against Timothy and Edra Blixseth [Adversary Proceeding No. 09-00017].

On March 23, 2009, Peters, in his capacity as counsel for Cincinnati, responded to

Sekits's March 9, 2009, notice of claim stating, "[a]s explained more fully below, the *Snow*

lawsuit [Adversary Proceeding 09-00018] arises out of the 'wrongful acts' of which Cincinnati

was given notice in the January 30, 2009 letter.  The Snow lawsuit is therefore considered to be a

'claim' first made on January 30, 2009."  Peters continued in the letter of March 23, 2009:

> The *Snow* lawsuit involves loans and transfers of funds made by YMC to
> various entities owned and controlled by Timothy and Edra Blixseth, the founders
> of YMC.  The *Snow* plaintiffs allege that Mr. and Mrs. Blixseth were until
> recently CEO and COO, respectively, of YMC.[9]  Please inform us if either Mr. or

---

[9] It is alleged in the *Snow* complaint that Mr. Blixseth ceased to be an officer of YMC in
July or August of 2008.  It is unclear whether Mr. Blixseth is currently an officer or director of
YMC.  According to an April 4, 2008 affidavit signed by Ms. Blixseth, she ceased to be an
officer of YMC around January 2007.  However, it is alleged in the *Unsecured Creditors* II
lawsuit that Ms. Blixseth was reinstated to the position of COO in August of 2008.

Ms. Blixseth is currently a director or officer of YMC. The Blixseths also own and control BLX Group, Inc. f/k/a/ Blixseth Group, Inc. ("BGI"). BGI owns an 82% equity interest in YMC, but is not a named insured under the Policy. The *Snow* plaintiffs are members of YMC who collectively own 7.1428% of YMC. The *Snow* lawsuit does not name YMC as a defendant, only the Blixseths and BGI.

The *Snow* lawsuit alleges that BGI and the Blixseths obtained from Credit Suisse a $375 million loan in September 2005, using nearly all of YMC's assets as collateral. Using the proceeds of the $375 million loan, YMC loaned $209 million to BGI pursuant to a promissory note dated September 30, 2005. The plaintiffs in the *Snow* lawsuit allege that this loan was not a loan, but actually a dividend that the Blixseths distributed to themselves to the exclusion of the plaintiffs, who were entitled to a pro rata share of any distribution made to YMC's members.

The *Snow* plaintiffs also allege that the Blixseths improperly used an additional $108 million to $133 million of the Credit Suisse loan proceeds to purchase real property around the world for their own personal benefit. This alleged use was also effectively a dividend distribution the Blixseths made to themselves without allocating the plaintiffs their pro rata share. The *Snow* plaintiffs further allege that the Blixseths made $64.5 million in other distributions from YMC which were improper because the plaintiffs did not receive their pro rata share.

The *Snow* complaint alleges "wrongful acts" of which Cincinnati received notice in the January 20, 2009 letter from YMC's counsel. The loans and the distributions allegedly made by the Blixseths in the *Snow* complaint correspond to the "transfers of assets to persons and/or entities outside [YMC] without proper authorization" in the notice letter.

\* \* \*

The allegations of misconduct in the *Unsecured Creditors I* lawsuit [Adversary Proceeding No. 09-00010] concern Ms. Blixseth's alleged wrongful actions as owner of BGI, not as an officer of YMC. The actions allegedly taken by Ms. Blixseth were not taken solely in her capacity as a director or officer of YMC. Ms. Blixseth's alleged actions therefore do not meet the Policy's definition of "wrongful acts" as defined by the Policy, there is no coverage under the Policy for the *Unsecured Creditors I* lawsuit. If the *Unsecured Creditors I* lawsuit is amended at a future date to include "wrongful acts" under the Policy's definition, Cincinnati will provide an updated coverage opinion at that time.

The *Unsecured Creditors II* lawsuit [Adversary Proceeding 09-00017] does not name as a defendant YMC, its subsidiary, directors, officers, or employees. Only Credit Suisse is named as a defendant. Therefore, the action is not a "proceeding initiated against any of the 'insureds,' nor is it "a civil, administrative, or regulatory investigation," or "a written demand for monetary damages or other relief." It is therefore not a "claim" under the Policy and no coverage is available for the *Unsecured Creditors II* lawsuit under the Policy. Should the *Unsecured Creditors II* lawsuit be amended in the future to name YMC, its subsidiary, directors, officers, or employees as a defendant, Cincinnati will provide an updated coverage opinion

Peters sent Sekits yet another letter on May 20, 2009, which reads in part:

You previously submitted notice to Cincinnati of the following three lawsuits: *Michael Snow, et al. v. BLX Group, Inc., et al.* (the "*Snow* lawsuit"); *Official Committee of Unsecured Creditors v. BLX Group, Inc., et al.* (the "*Unsecured Creditors I* lawsuit"); and *Official Committee of Unsecured Creditors v. Credit Suisse, et al.*, (the "*Unsecured Creditors II* lawsuit").

As you know, in our March 23, 2009 letter to you, we accepted on Cincinnati's behalf the defense of Timothy and Edra Blixseth for the *Snow* lawsuit. In that letter, we noted that the Policy contains a duty to defend and that Cincinnati was willing to appoint counsel to defend the case from Cincinnati's panel counsel list. We also noted that Cincinnati would consider providing consent to counsel selected by the Blixseths to defend the *Snow* action, as long as counsel fully cooperated with Cincinnati. However, in order for Cincinnati to consent to counsel selected by the Blixseths, Cincinnati requires the name of counsel and the hourly billing rates charged by counsel. To date, we have not received a response to this letter. Please let me know as soon as possible how the Blixseths would like to proceed with the defense of the *Snow* action.

In response to the above letter, Sekits sent Peters a letter on June 23, 2009, advising that Gary S. Deschenes was Debtor's personal counsel. Sekits also advised in that same letter that Michael W. Doyle was Blixseth's personal counsel.

In connection with Adversary Proceeding 09-00018, Cincinnati sent at least three letters to Debtor's counsel, Gary S. Deschenes ("Deschenes"), offering to tender a defense to Debtor. For instance, on July 24, 2009, Peters sent Deschenes a letter which reads in part:

22

> We understand from Matthew Sekits that you are personal counsel for Edra Blixseth. We also understand from Mr. Sekits that he forwarded to your attention the coverage letter dated March 23, 2009 regarding the *Snow* and *Unsecured Creditors* lawsuits. In case you have not yet received a copy of the coverage letter from Mr. Sekits, please find a copy of the coverage letter enclosed.
>
> You will note from the coverage letter that the Policy contains a duty to defend. As I indicated in the coverage letter, Cincinnati is agreeable to providing consent to Ms. Blixseth for counsel selected by Ms. Blixseth to defend the Snow litigation provided that Ms. Blixseth identified her preferred counsel, provided me with the rate structure for counsel and counsel agreed to fully cooperate with Cincinnati in the defense of the action. I assume that you have been selected by Ms. Blixseth to defend the action. Please confirm that this is the case and provide me with the billing rates for your firm. Please also provide me with an update of litigation developments in the Snow litigation.

Peters sent additional letters to Deschenes on August 19, 2009, and October 2, 2009. Neither Debtor nor Deschenes responded to Cincinnati's offer to tender a defense.

Adversary Proceeding 09-00017 was eventually consolidated with Adversary Proceeding 09-00014. Blixseth intervened in Adversary Proceeding 09-00014. Blixseth's involvment in Adversary Proceeding 09-00014 was apparently brought to Cincinnati's attention because on November 10, 2009, Cincinnati filed in YMC's main bankruptcy case a motion seeking relief from the automatic stay so Cincinnati could defend and advance payment of defense costs in accordance with and subject to the terms, conditions and limitations of the Policy. Cincinnati argued in its November 10, 2009, motion:

> 7. Timothy L. Blixseth has sought coverage and defense for the following lawsuits:
>
> > i. *Michael Snow, et al. v. Timothy L. Blixseth, Edra D. Blixseth, et al.*, Adversary Proceeding Number 09-00018 (the "Snow Action");
> >
> > ii. Counterclaim of the Official Committee of Unsecured Creditors to Timothy Blixseth's Complaint in Intervention which was filed in *Official Committee of Unsecured Creditors v. Credit Suisse,*

23

*Cayman Islands Brach, et al.*, Adv. Pro. No. 09-014 (the "Creditor Counterclaim").

8. Timothy Blixseth has incurred attorneys' fees and costs defending against the Snow Action and the Creditor Counterclaim, and will continue to incur attorneys' fees and costs defending against them.

9. Demand has been made under the Policy to defend Timothy Blixseth in the Snow Action and Creditor Counterclaim and to pay the attorneys' fees and costs that Timothy Blixseth has incurred and will incur in defense of the Snow Action and the Creditor Counterclaim.

10. Pursuant to the terms and conditions of the Policy, the payment of legal fees and related costs incurred in defense of the Snow Action and Creditor Counterclaim reduce the $5 million aggregate limit of liability of the Policy by all amounts paid.

11. Cincinnati has agreed to defend and pay the defense costs that Timothy Blixseth has incurred and will incur in defense of the Snow Action and the Creditor Counterclaim, subject to a full and complete reservation of all of its rights, remedies and defenses.

12. The filing of the Petition in bankruptcy creates an estate consisting of the Debtor's property, which is subject to an automatic stay. 11 U.S.C. §§541(a), §362(a).

13. The Policy is an asset of the Yellowstone Mountain Club estate, and the proceeds of the Policy are also an asset of the Yellowstone Mountain Club estate since the Policy provides, subject to its terms, conditions and limitations, direct coverage to the Debtor, Yellowstone Mountain Club. *See*, *In Re The Minoco Group of Companies Ltd. v. First State Underwriters Agency of New England,* 799 F.2d 517 (9th Cir. 1986); *In Re Allied Digital Technologies Corp.*, 306 B.R. 505 (Bkrtcy.D.Del. 2004); *In Re Arter & Hadden, L.L.P.*, 335 B.R. 666 (Bkrtcy.N.D.Ohio 2005).

14. Because the automatic stay applies to any act to obtain possession of property of the estate or of property from the estate, and because the payment of defense costs reduces the Policy's limit of liability, Cincinnati has filed this motion pursuant to Section 362 (d)(1), 11 U.S.C. §362 (d)(1), seeking relief from the automatic stay to defend and pay the defense costs that Timothy Blixseth has incurred and will incur in defense of the Snow Action and the Creditor Counterclaim, pursuant to the terms, conditions and limitations of the Policy, and subject to a full and complete reservation of all of its rights, remedies and

24

defenses.

15. There is cause to lift the automatic stay because Timothy Blixseth will be harmed if prevented from seeking a defense under the Policy to fund his defense of the Snow Action and the Creditor Counterclaim and Cincinnati will be harmed if precluded from defending Timothy Blixseth pursuant to the Policy terms.

16. Because the payment of defense costs reduces the limit of liability under the Policy, Cincinnati requests that this Court further find that the payment of such defense costs reduces the limit of liability of the Policy by the amount that is paid.

After receiving no objection to Cincinnati's motion, the Court entered an Order on November 17, 2009, granting Cincinnati its requested relief.

As mentioned previously, Richardson was appointed trustee in Yellowstone Club World, LLC's bankruptcy case on February 18, 2009. Richardson sought to employ Amsden as counsel on March 19, 2009. Amsden claims he did not learn of the Policy until January of 2010. Contrary to Amsden's testimony, the Court's records show Cincinnati attached a complete copy of the Policy to its November 10, 2009, motion for relief from the automatic stay. The motion, and the Court's November 17, 2009, order granting the same, were served electronically on Amsden, Cotner, Ford Elsaesser, Deschenes, and Richardson.

In the interim, on March 17, 2009, Richardson filed Proof of Claim No. 664 in the bankruptcy case of YMC asserting an estimated claim on behalf of Yellowstone Club World in the amount of $50 million. Richardson amended said claim on July 20, 2009, asserting a total claim of $103,587,987 of which $4,190,000 was claimed as a priority claim. On July 29, 2009, Richardson filed Proof of Claim No. 46 in Debtor's bankruptcy case asserting a total claim of $103,587,987. Richardson amended said claim on August 4, 2009, but still asserted a total claim

on behalf of Yellowstone Club World of $103,587,987.

In connection with the above claims, Amsden sent a letter dated April 3, 2009, to Danika Investments, Ltd., advising he represented Richardson and asserting a claim of no less than $5,432,623.50 for payments of expenses by Yellowstone Club World in 2006 and 2007 related to the Chateau de Farcheville. Amsden also asserted "Right of Use" and "Option to Purchase" claims against the Chateau de Farcheville stemming from the Five-Party Agreement, which agreement was attached to Amsden's April 3, 2009, letter. On April 14, 2009, Amsden sent a similar letter to Ms. Clare Lawson and Mr. Ben Ward of Ireland, Mr. James Leavy of Paris, France and Mr. Guido Portier of New York, New York, who Amsden believed were "counsel to, or the authorized representative of, Danika Investments, Ltd., or its equity holder(s)." Amsden also sent a similar letter on April 16, 2009, to Fortis Intertrust Netherlands.

Neither the proofs of claim filed by Richardson on behalf of YCW in YMC and Debtor's bankruptcy cases nor Amsden's April 2009 letters, as discussed above, were provided to Cincinnati until February 3, 2010, when Amsden faxed a letter to the "Casualty Claims Manager" at Cincinnati. Amsden also sent his February 3, 2010, letter, with numerous enclosures, to Cincinnati by Federal Express. Amsden's February 3, 2010, letter, along with the enclosures, was received by Cincinnati on February 4, 2010. In the letter of February 3, 2010, Amsden wrote:

> I represent Ross P. Richardson, Chapter 7 Trustee for Yellowstone Club World, LLC. We hereby tender the following matters to you for payment:
>
> 1. Proof of Claim in Yellowstone Mountain Club, LLC, Case No. 08-61570; and POC No. 664-1, dated March 17, 2009;
> 2. Amended Proof of Claim in Yellowstone Mountain Club, LLC, Case No. 08-61570; and POC No. 664-2, dated July 20, 2009;

3.     Proof of Claim in Edra D. Blixseth, Case No. 09-60452; and POC No. 46-1, dated July 29, 2009;

4.     Amended Proof of Claim in Edra D. Blixseth, Case No. 09-60452; and POC No. 46-2, dated August 4, 2009; and

5.     Second Amended Complaint in Richardson v. Blixseth and Huckestein, et al, Case No. 09-00086, Dkt. No. 9, dated November 24, 2009.

The insureds' conduct complained of, as indicated in the above, includes without limitation, the following:

1.     Failure to respond to litigation pending against Yellowstone Club Development and/or its subsidiary ("YD"), and Yellowstone Club World, LLC ("YCW"), resulting in a default judgment exceeding $16,000,000;

2.     Failing to respond to judgment by the Lemond group against Yellowstone Mountain Club and/or its subsidiaries ("YMC") and YCW, resulting in a judgment exceeding $13,000,000;

3.     Failure to adequately document and protect the interests of YMC and YD, resulting in claims as specified above;

4.     Failure to take steps to block a fraudulent transfer in favor of YMC and Edra Blixseth, resulting in judgments exceeding $1 million; and

5.     Failure to safeguard the property of others, including YCW, resulting in claims as specified above.

The enclosures to the above letter included: (1) a copy of Proof of Claim No. 664 filed March 17, 2009, in YMC's bankruptcy case, which included part of a Yellowstone Club World Fact Sheet, the Five-Party Agreement and numerous pages of accounting records; (2) a copy of amended Proof of Claim No. 664 filed July 20, 2009, which had attached thereto a written summary of the amended proof of claim, copies of bank records from Stockman Bank, the transcript of Debtor's 341 meeting of creditors held May 14, 2009, part of the Yellowstone Club World Fact Sheet, the Five-Party Agreement, along with a summary of Richardson's calculation of the value of the rights of use at the Chateau de Farcheville, Tamarindo, Turks and Caicos, and St. Andrew; (3) a copy of Proof of Claim No. 46 filed July 29, 2009, a copy of amended Proof of Claim No. 46

27

filed August 4, 2009, with attachments; and (4) a copy of the Second Amended Complaint for Equitable Subordination, Declaratory Judgment and Damages filed by Richardson against Blixseth and various of his entities in Adversary Proceeding No. 09-00086.

Amsden testified that at the time he sent his February 3, 2010, letter to Cincinnati, he was not aware of the notice of wrongful act letters sent by Sekits to Cincinnati on January 30, 2009. Thus, Amsden was not attempting to assert a claim that would fit within YMC's timely filed notice of wrongful acts. Rather, Amsden was seeking to assert an outright claim under the Policy.

As discussed in great detail below, the evidence also shows that on February 3, 2010, when Amsden sent his letter to Cincinnati, he intended to tap into the Policy limits not with claims associated with the options and rights of use set forth in the Five Party Agreement, as Plaintiffs now argue, but rather, with judgment debts asserted at that time against YCW by Scotia Enterprises S.A. and Revalia-Comercio Internacional Sociedade totaling $16,986,735 stemming from litigation involving the St. Andrews property in Scotland.

In 2009 and 2010, the debtors and trustees in Debtor's bankruptcy case and in the bankruptcy cases of BLX, YCW and the Yellowstone Club entities were facing enormous claims and parties were scrambling to lay claim to a finite number of assets. Parties were also cognizant, at least on some level, that the second phase of trial in Adversary Proceeding 09-00014, wherein the Yellowstone Club Liquidating Trust was asserting a $286.4 million counterclaim against Blixseth, was scheduled to commence February 24, 2010. At least two mediations were scheduled in the weeks leading up to the February 24, 2010, trial, and some, including Amsden, were advocating for a global settlement.

On February 4, 2010, Amsden sent Cincinnati a copy of an Order entered February 3, 2010, in Adversary Proceeding 09-00086 by the Honorable John L. Peterson, United States Bankruptcy Judge, scheduling a mediation conference for February 11, 2010, in Butte. Adversary Proceeding 09-00086 was an action filed by Richardson against Blixseth and numerous of his entities. That Adversary Proceeding did not involve Debtor. As reflected in a motion for order approving settlement filed by Amsden in YCW's main bankruptcy case on February 12, 2010, YCW and Blixseth settled their claims at the February 11, 2010, mediation.

Following the February 11, 2010, mediation, Richardson and Samson filed a joint motion for mediation in Debtor's main bankruptcy case, seeking to resolve YCW's Proof of Claim No. 46. The Court granted the joint motion for mediation on February 16, 2010. On February 15, 2010, Amsden sent Cincinnati another letter advising Cincinnati of the second mediation before Judge Peterson scheduled for February 17, 2010. Amsden testified that Cincinnati did not attend the February 2010 mediations in person and similarly did not attend "live on the telephone." However, because of the limited notice, Cincinnati could not have attended the mediations. Moreover, Cincinnati made it known to at least Blixseth's counsel, that in the event of a global settlement, Cincinnati was available by telephone during the mediations.[10]

After filing an objection to Scotia Enterprises S.A. and Revalia-Comercio Internacional Sociedade's proofs of claim on January 15, 2010, after sending his February 3, 2010, letter to Cincinnati and after the February 11, 2010, mediation, when Blixseth settled his claims with

---

[10] Victor Peters conceded during questioning by Plaintiffs' counsel "that Tim Blixseth and his attorney team were rabid that Cincinnati Insurance should not inject itself in a mediation" because "it would jeopardize their defense of the most complicated litigation that ever existed in Montana history[.]"

YCW, and prior to the February 17, 2010, mediation, Amsden sent Samson and Cotner an email

on Monday, February 15, 2010, asking that Cotner and Samson review a stipulation relating to

the claims asserted by Scotia Enterprises S.A. and Revalia-Comercio Internacional Sociedade

against YCW.

       In response to Amsden's February 3, 4 and 15, 2010, letters, Peters, on February 17,

2010, sent a response to Amsden advising "that neither Ross P. Richardson nor Yellowstone

Club World, LLC are Insureds under the policies of insurance that Cincinnati issued to

Yellowstone Mountain Club, LLC.  Consequently, Cincinnati will not respond to the items and

issues raised in your letters.  Should you have any questions please feel free to contact me or my

colleague Rob Fish[.]"

       After receipt of Peters' February 17, 2010, letter, Amsden, on February 19, 2010, sent

Cotner and Samson another email seeking approval of a stipulation that would in part, allow

Amsden to proceed against Cincinnati with respect to the claims asserted by Scotia Enterprises

S.A. and Revalia-Comercio Internacional Sociedade:

> Have you had a chance to review the stipulation?  While on its face a little
> complicated, it is really a straightforward request to proceed as against the
> insurance policy in response to Scotia's claims.  The insurance company has
> refused to respond, and denied any liability.  As you know, there now is now [sic]
> policy limit or restriction and it should assist all of us in producing resources for
> the final resolution of these cases.  If you can't stipulate, can you simply agree that
> you do not oppose?

Amsden also sent an email to Debtor's counsel on March 30, 2010, asking for his consent "to lift

stay to pursue insurance for parts of our proof of claim."  On July 1, 2010, Deschenes finally

faxed a consent to a motion to modify stay "dated the ___ day of April 2010."  However,

Amsden never filed a request for relief from the automatic stay, to which he now had Deschenes'

consent, because by that time, Richardson, Scotia Enterprises S.A. and Revalia-Comercio Internacional Sociedade had entered into a Settlement and Release Agreement whereby Scotia Enterprises S.A. and Revalia-Comercio Internacional Sociedade agreed to withdraw their proofs of claim filed in YCW's bankruptcy case.  In other words, the original claim for which Amsden was seeking payment from Cincinnati no longer existed.

Finally, Amsden testified that at the time of the February 2010 mediations, he was not aware that Cincinnati had accepted the defense of Blixseth under the Policy.  As noted earlier, Amsden was served with a copy of Cincinnati's November 10, 2009, motion to modify stay and the Court's Order granting the same.  Thus, Amsden had or should have had a copy of the Policy as of November 10, 2009, and knew or should have known by that same date that Cincinnati was seeking to defend Blixseth under the Policy.  Indeed, by February 3, 2010, Cincinnati had already paid defense costs on behalf of Blixseth totaling $1,547,052.39 and Exhibit ZZZ suggests Cincinnati paid an additional $1,142,508.14 between February 12, 2010, and April 23, 2010.  Blixseth exhausted the Policy limits sometime around November of 2010.

Following receipt of Peters' February 17, 2010, letter, Amsden made no further attempt to contact Peters, Fish or Cincinnati.  Likewise, neither Richardson nor Amsden asked Samson, Debtor or YMC to contact Cincinnati on YCW's behalf.  Instead, Amsden filed on January 18, 2011, in Debtor's main bankruptcy case, a stipulation between Richardson and Samson titled "Stipulation for Allowance of Claim No. 46 and Relief From Stay to Pursue Insurer," which stipulation granted YCW an allowed claim of $9,699,455, granted relief from the automatic stay to permit YCW to pursue any and all claims it might have against Cincinnati and provided that YCW would look solely to Cincinnati for recovery on its allowed claim of $9,699,455.  The

stipulation filed January 18, 2011, provided that "Edra Blixseth was an officer, director and/or managing agent of Yellowstone Club World, LLC from at least August 20, 2008 to January 31, 2009[,]" and that on behalf of YCW and YD, she did not document and record the use and rights of use agreement with respect to the Chateau de Farcheville or St. Andrews.

Cincinnati opposed approval of the stipulation filed January 18, 2011.  Amsden then filed an Amended Stipulation for Allowance of Claim No. 46 and Relief from Stay to Pursue Insurer on March 31, 2011.  The Amended Stipulation deletes the provision which referred to Debtor as an officer, director and/or managing agent of YCW.  The change was admittedly made because the Policy does not cover officers and directors of YCW.

Following a hearing held April 4, 2011, the parties, including Cincinnati, filed a proposed order with respect to approval of the amended stipulation.  The Court entered the parties' proposed Order on April 6, 2011, approving the aforementioned stipulation.  The Court's Order reads in relevant part:

> 2.  The YCW Chapter 7 Trustee's Claim No. 46 shall be ALLOWED as a general unsecured claim in the amount of $9,699,455;
>
> 3.  The YCW Chapter 7 Trustee is hereby granted relief from stay to pursue any and all claims he may have as against Cincinnati with respect to such allowed claim;
>
> 4.  The YCW Chapter 7 Trustee shall look solely to Cincinnati for recovery on his allowed claim.  YCW Chapter 7 Trustee shall not seek to have his allowed claim enforced against either Edra D. Blixseth or any asset of the Estate of Edra D. Blixseth; provided, however, that the YCW Chapter 7 Trustee may enforce his allowed claim in full against Cincinnati and all applicable insurance policy/policies to the fullest extent permitted under applicable law;
>
> 5.  To the extent the Blixseth Trustee chooses to pursue a first party claim against Cincinnati, the Trustees shall work together in a cooperative manner with respect to such claims.  In that event, the Trustees shall enter into an agreement whereby they will agree to an allocation of the recovery from Cincinnati, whether the same arises from the first

32

party claim, the third party claim, by settlement or by judgment; provided however, that the YCW Chapter 7 Trustee shall pursue all applicable claims against Cincinnati under Montana law including for the entire amount of the allowed claim on behalf of the Estate of Yellowstone Club World to the fullest extent permitted under applicable law, and the Blixseth Trustee shall pursue all applicable first party claims to the fullest extent permitted under applicable law;

6.  Fixing the allowed claim in accordance with the foregoing and the approval of the Amended Stipulation for Allowance of Claim and Relief from Stay to Pursue Insurer is without prejudice or effect to the right of Cincinnati to defend against or oppose the allowed claim or any other claim made against Cincinnati by the YCW Chapter 7 Trustee, the Blixseth Trustee or any other party on any ground to the fullest extent permitted under applicable law; and

7.  This Order does not determine the liability of Cincinnati under its Policy for any claim made against Cincinnati by the YCW Chapter 7 Trustee or the Blixseth Trustee or any other party.

In the process of fixing the amount of YCW's stipulated claim at $9,699,455, Richardson hired French attorney Pierre-Francois Veil to review the French land registry records and ascertain whether the Five-Party Agreement or the right of use and option to purchase contained therein had been recorded in France.  A document titled K/BIS in France, which is a form of corporate record, allowed Veil to identify the representatives for Chateau de Farcheville.  The French representative in charge of Farcheville at that time was Frida Peters.  After being placed in a French liquidation proceeding, Farcheville was eventually sold in May of 2010 for approximately 9.155 million euros, or roughly $13 to $14 million.  YCW attempted to record the right of use and option but such attempts were denied because the options and rights of use granted by YMC and YD were not "granted by the owner [Danika] and hadn't been properly recorded."

Although YCW was not successful in recording the rights of use or options, YCW was able to file a proof of claim in the liquidation proceeding.  YCW eventually "received about 3.4

33

million euros on the debt claim and about 3 million euros for the equity." Adding the foregoing to settlements reached with the Yellowstone Club entities and Blixseth, YCW has or should receive roughly $8 million from the Chateau de Farcheville.

Garden testified YCW advanced approximately $3 million in funds to operate St. Andrews. Subsequent to the Yellowstone Club entities' bankruptcy, the St. Andrews property went into a liquidation proceeding in Scotland and was sold to the original seller for 820,000 pounds. Garden testified that "as a result of the global mediation and the settlements that we reached with various parties, the YCW trustee ended up with about 30 percent of the claims in the Scottish liquidation, and we received about $300,000 based on our claim subsequent to the sale of the property and liquidation."

Garden conceded during this testimony that the Five-Party Agreement is "not an actual option and right of use, as we've discovered in all four of these jurisdictions, that's enforceable against the resort property. The only option and right of use that would have been enforceable against any of these properties from what we learned was an option and a right of use that would have been granted by the owner of the property, not by the user." In other words, the Five-Party Agreement, and the options and rights of use were not enforceable against Chateau de Farcheville because it was not granted or recorded by the owner of the property, Danika. Danika was not a party to the Five-Party Agreement. The same held true for St. Andrews.

## CONTENTIONS of the PARTIES

Based upon the above facts, Plaintiffs seek to enforce against Cincinnati the stipulated judgment entered into by YCW and Samson, which grants YCW an allowed claim of $9,699,455 in Debtor's bankruptcy case. Plaintiffs contend Cincinnati is liable for the entire

34

amount of the stipulated judgment because: (1) Cincinnati breached its duty to defend under the Policy when it failed to respond to Amsden's February 3, 2010, letter; (2) Cincinnati violated MCA §§ 33-18-201(2) and (4) when it failed to acknowledge and act reasonably promptly to Amsden's February 3, 2010, letter and when it failed to conduct a reasonable investigation before refusing to pay the claims asserted in Amsden's letter; (3) that Cincinnati breached its duty of good faith and fair dealing; and (4) that it violated the automatic stay of 11 U.S.C. § 362(a)(3) in Debtor's bankruptcy case.  Cincinnati counters that Plaintiffs' claims are barred because they cannot prove that all conditions precedent have been met and that they have fully complied with all terms of the Policy.

APPLICABLE LAW and DISCUSSION

As just mentioned, in response to the Plaintiffs' claims, Cincinnati counters that neither Debtor nor Samson provided Cincinnati with notice of YCW's alleged claim and thus, Debtor and Samson failed to satisfy a condition precedent under the terms of the Policy.  Under the facts of this case, the Court agrees with Cincinnati.

The interpretation of insurance policies is well established in Montana:

> This Court has repeatedly held that general rules of contract law apply to insurance policies and that we will construe those policies strictly against the insurer and in favor of the insured.  *Travelers Cas. v. Ribi Immunochem Research*, 2005 MT 50, ¶ 17, 326 Mont. 174, 108 P.3d 469.  Moreover, the interpretation of an insurance contract is a question of law.  *Park Place Apartments v. Farmers Union*, 2010 MT 270, ¶ 12, 358 Mont. 394, 247 P.3d 236 (citing *Cusenbary v. U.S. Fidelity and Guar. Co.*, 2001 MT 261, ¶ 9, 307 Mont. 238, 37 P.3d 67; *Babcock v. Farmers Ins. Exchange*, 2000 MT 114, ¶ 5, 299 Mont. 407, 999 P.2d 347).  When a court reviews an insurance policy, it is bound to interpret its terms according to their usual, common sense meaning as viewed from the perspective of a reasonable consumer of insurance products. *Park Place*, ¶ 12 (citing *Counterpoint, Inc. v. Essex Ins. Co.*, 1998 MT 251, ¶ 13, 291 Mont. 189, 967 P.2d 393). Exclusions from coverage are to be narrowly and strictly construed because

35

they are contrary to the fundamental protective purpose of an insurance policy. *Park Place*, ¶ 12 (citing *Swank Enterprises v. All Purpose Services*, 2007 MT 57, ¶ 27, 336 Mont. 197, 154 P.3d 52).

When an insurance policy is ambiguous, it is to be interpreted most strongly in favor of the insured and any doubts as to coverage are to be resolved in favor of extending coverage for the insured. *Park Place*, ¶ 13 (citing *Mitchell v. State Farm Ins. Co.*, 2003 MT 102, ¶ 26, 315 Mont. 281, 68 P.3d 703). An ambiguity exists where the insurance contract, taken as a whole, is reasonably subject to two different interpretations. *Park Place*,¶ 13 (citing *Mitchell,* ¶ 26). However, when the language of a policy is clear and explicit, the policy should be enforced as written. *United Nat. Ins. v. St. Paul Fire & Marine*, 2009 MT 269, ¶ 12, 352 Mont. 105, 214 P.3d 1260 (citing *National Cas. Co. v. American Bankers*, 2001 MT 28, ¶¶ 13, 304 Mont. 163, 19 P.3d 223). We cautioned in *Travelers* that courts should not "seize upon certain and definite covenants expressed in plain English with violent hands, and distort them so as to include a risk clearly excluded by the insurance contract." *Travelers*, ¶ 17 (quoting *Johnson v. Equitable Fire & Marine Ins. Co.*, 142 Mont. 128, 131, 381 P.2d 778, 779 (1963)).

* * *

Notice provisions in insurance policies have been evaluated and considered by this Court as far back as 1925. *In LaBonte v. Mutual Fire & Lightning Ins. Co.*, 75 Mont. 1, 12, 241 P. 631, 635 (1925), this Court held that a notice requirement in an insurance policy "is a condition precedent, and failure to comply therewith will bar a recovery under the policy, unless the condition is waived by the company." And, in *Riefflin v. Hartford Steam Boiler Inspection & Ins. Co.*, 164 Mont. 287, 293, 521 P.2d 675, 678 (1974), we upheld the lower court's judgment that "failure of the [insureds] to submit notifications of accident and proof of loss to [the insurer] as soon as practicable, as required by the policy, barred any claims for reimbursement...."

*Steadele v. Colony Ins. Co.*, 260 P.3d 145 (Mont. 2011).

The Policy in this case is straightforward:

*As a condition to coverage under this Policy*:

A.   The "*policy insureds*" shall give us written notice of any "claim" made against any of the "policy insureds" for a "wrongful act" as soon as practicable, and shall give such information and cooperation as we may reasonably require, including but not limited to a description of the "claim", the nature of the alleged "wrongful act",

36

the nature of the alleged injury, the names of the claimants, and the manner in
which the "policy insureds" first became aware of the "claim".  As soon as
practicable, the "policy insureds" shall furnish us with copies of reports,
investigations, pleadings and other papers in connection with the "claim"[.]

(Emphasis added).  "Policy insureds" are specifically defined in the Policy as "the natural

persons and entities insured under each respective Coverage Part for which coverage is set forth

in the Declarations for the policy, but shall not include any current or past partnership, joint

venture or limited liability company unless such partnership, joint venture or limited liability

company is shown as an 'insured entity' in the Declarations of the applicable Coverage Part."

Under Coverage Part I, pertaining to Directors and Officers Liability and Company Coverage, an

"insured" is defined as "the 'company' and the 'directors and officers'."

YMC, a Policy Insured, submitted, through Sekits, a timely notice of wrongful act.

Thereafter, YMC, a Policy Insured, submitted various claims to Cincinnati, namely Adversary

Proceedings 09-00018, 09-00010 and 09-00017.  Richardson and YCW, on the other hand, are

not "policy insureds."  Thus, Cincinnati was justified in advising Amsden in the letter of

February 17, 2010, that because "neither Ross P. Richardson nor Yellowstone Club World, LLC"

were "Insureds under the policies of insurance that Cincinnati issued to Yellowstone Mountain

Club LLC" that Cincinnati would "not respond to the items and issues raised in" Amsden's

February 2, 2010, letter.  Plaintiffs could have easily satisfied the stated condition precedent by

doing one of two things: (1) Amsden could have given all his material to Samson and asked

Samson to submit the claim to Cincinnati; or (2) Plaintiffs could have asked YMC to submit the

claim.  Plaintiffs provide no explanation for their failure to pursue one of the foregoing options.

In the alternative, and as a third option, YCW could have secured an order from this

Court lifting the automatic stay so YCW could pursue Cincinnati on the claim.  While Amsden did secure an Order lifting the automatic stay on April 6, 2011, it was long after Amsden had sent his letter to Cincinnati on February 3, 2010, and it was also after YCW had settled its claim against Debtor's estate on January 18, 2011.

Rather than make any attempt to contact Cincinnati or pursue one of the three actions listed above, Amsden, upon receipt of Peters' letter dated February 17, 2010, sent Cotner and Samson an email on February 19, 2010, regarding a stipulation for allowance of Scotia's claim, stating "it is really a straightforward request to proceed as against the insurance policy in response to Scotia's claims.  The insurance company has refused to respond, and denied any liability.  As you know, there now is now [sic] policy limit or restriction and it should assist all of us in producing resources for the final resolution of these cases."

The Policy in this case is very clear that "policy insureds" shall give "written notice of any 'claim'" as a condition precedent to coverage.  The language of the Policy is clear and explicit, and "should be enforced as written." *United Nat. Ins. v. St. Paul Fire & Marine*, 2009 MT 269, ¶ 12.  Plaintiffs' failure to satisfy the stated condition precedent bars the recovery now sought.  *Steadele*, 260 P.3d at 150.

Notwithstanding the plain language of the Policy, Plaintiffs contend a third-party claimant may nevertheless satisfy a notice provision under a claims-made policy.  Plaintiffs, citing *Cincinnati Companies v. West American Ins. Co.*, 701 N.E.2d 499 (Ill. 1998), argue Amsden's third-party letter of February 3, 2010, provided Cincinnati with actual notice of a claim against Debtor, thus triggering Cincinnati's duty to defend.  *Cincinnati Companies v. West American Ins. Co.* is factually distinguishable from the case at bar.  First, *West American Ins.* was a case

involving equitable contribution from one insurance company to another.  In addition, the court

in *West American Ins*. specifically noted that "neither Cincinnati nor West American argues

governance of the terms of the policy with respect to when the duty to defend arises.

Consequently, policy defenses have not been a factor in our decision."  701 N.E.2d at 502, fn.1.

In this case, Policy defenses are an issue.

More importantly, the Court is not persuaded by Plaintiffs' "actual notice" argument

because in *West American Ins*., the court held:

> [T]hat where the insured has not knowingly decided against an insurer's
> involvement, the insurer's duty to defend is triggered by actual notice of the
> underlying suit, regardless of the level of the insured's sophistication.

Plaintiffs argue at pages 40 and 41 of their post-trial Proposed Findings of Fact and Conclusions

of Law:

> Notice from third party claimants is justified by policy considerations.  In
> fact, the Supreme Court of Illinois has set forth several reasons and rationale for
> adopting this rule in a case involving Cincinnati Companies. *In Cincinnati
> Companies v. West American Insurance Co.*, 701 N.E. 2d 499, 233 Ill. Dec. 649
> (1988), the court noted as follows:
>
> •    It is true that an insured may choose to forego an insurer's assistance for
>      various reasons, such as the insured's fear that premiums would be
>      increased, or the policy cancelled, in the future. . . . The duty to defend
>      may be discharged simply by contacting the insured to ascertain whether
>      the insurer's assistance is desired. If the insured indicates that it does not
>      want the insurer's assistance, or is unresponsive or uncooperative, the
>      insurer is relieved of its duty to defend. (citation omitted) 701 N.E. 2d at
>      503 and 504.
>
> •     The insurer can simply ask the insured if the insurer's involvement is
>      desired, thus eliminating any uncertainty of the question.

What Plaintiffs conveniently ignore is that Cincinnati tried on at least three occasions to

tender a defense to Debtor.  Debtor and her counsel were unresponsive.  According to Plaintiffs'

own argument, Cincinnati was thus relieved of its duty to defend.

Plaintiffs' failure to have a "Policy Insured" give notice of YCW's claim, however, is not the only defect in this case. To have a covered claim, a "Policy Insured" must submit its claim within the extended reporting period. In the alternative, if a claim has not been asserted during the policy period, a "Policy Insured" may give timely notice of wrongful acts and Cincinnati then has a duty to defend any claim asserted after expiration of the policy period that arises out of the timely identified wrongful acts.

Plaintiffs maintain that Amsden's February 3, 2010, letter is a claim that fits within YMC's January 30, 2009, notice of wrongful act. In the alternative, Plaintiffs argue that under 11 U.S.C. § 108(b), YCW had until April 19, 2009, to assert a claim and that Proof of Claim Nos. 664 and 46 were timely filed. Plaintiffs' arguments, while novel, are not persuasive.

Section 108(b) provides:

(b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor . . . may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of--

> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

> (2) 60 days after the order for relief.

The Policy, which did not cover YCW, did not fix the period of time in which YCW could take action. The Policy fixed the time within which a "Policy Insured" could take certain action. Sixty days after the orders for relief in the Yellowstone Club entities' bankruptcies

expired January 9, 2009.  The Extended Reporting Period expired April 1, 2009.  Section 108(b) provides no relief to the Yellowstone Club entities.  Similarly, Debtor filed for bankruptcy protection on March 26, 2009.  The policy period had expired by that date, but the Extended Reporting Period had not.  One could thus argue that § 108(b) extended Debtor's Extended Reporting Period to May 25, 2009.  The Court, however, need not address whether § 108(b) would afford Debtor any relief because neither Debtor nor Samson attempted to tender a claim to Cincinnati on or before May 25, 2009.

Ignoring the foregoing, Plaintiffs argue YCW's claims were timely asserted under the Policy.  Richardson filed Proof of Claim 664 in YMC's bankruptcy case on March 17, 2009, but the claim was not provided to Cincinnati at that time and in fact, at no time has YMC sought to tender YCW's claim, as reflected in Proof of Claim 664, to Cincinnati for defense, even though YMC had tendered other matters to Cincinnati for defense.  Richardson did not file a claim in Debtor's case until July 29, 2009, which was well after expiration of any of the extended dates.  As stated earlier, neither Debtor nor Samson ever made any attempt to tender Proof of Claim 46 to Cincinnati for defense.  Regardless of when the claims were filed in the respective bankruptcy cases, the first time anyone sought to bring Proof of Claim nos. 664 and 46 to Cincinnati's attention was on February 3, 2010, when Amsden mailed the claims to Cincinnati.  The claims sent to Cincinnati by Amsden for the first time on February 3, 2010, were simply not timely under the Policy.

In the alternative, Plaintiffs maintain that YCW's claims against Debtor, as identified in Amsden's February 3, 2010, letter, and the attachments thereto, arise out of the wrongful act referenced in Sekits' January 30, 2009, letter.  The Court once again disagrees with Plaintiffs'

41

position.

Sekits' January 30, 2009, notice of wrongful acts and the subsequent correspondence between Sekits and Peters is clear.  The wrongful acts identified by Sekits involved "unauthorized transfers."  The summary of wrongful acts set forth in Amsden's February 3, 2010, letter involved failures to respond, failure to adequately document and protect, failure to block a fraudulent transfer and failure to safeguard the property of others.  The bad acts complained of by Amsden all involved the failure to do something while the wrongful acts identified by Sekits involved unauthorized transfers.

The evidence is clear that at the time Amsden sought to tender YCW's claim to Cincinnati, Amsden was tendering the claims made by Scotia Enterprises S.A. and Revalia-Comercio Internacional Sociedade against YCW.  Those claims arose as a result of Debtor or Blixseth's failure to defend an action, resulting in the equivalent of a default judgment. As the records in the various cases show, Scotia Enterprises S.A. and Revalia-Comercio Internacional Sociedade eventually withdrew their claims, leaving nothing for Cincinnati to defend.  It was not until later that counsel for YCW sought to shoehorn the claims stemming from the Five Party Agreement into Sekits January 30, 2009, notice of wrongful acts.

Again, under the specific, and perhaps unique, facts of this case, the Plaintiffs' own argument is fatal to their duty to defend claim.  The Plaintiffs went to great lengths at trial to convince the Court that the facts set forth in Amsden's February 3, 2010, letter and the attachments thereto were substantially similar to facts in Adversary Proceeding 09-00018, a case in which Cincinnati had tendered a defense.  Plaintiffs argue that the claims asserted in Adversary Proceeding 09-00018, on the one hand, and the claims asserted in Proof of Claim Nos.

664 and 46, on the other, have the same factual nexus in that they all stem from Blixseth's use of the Credit Suisse loan proceeds. Because of that factual nexus, Plaintiffs argue it was incumbent upon Cincinnati to accept and defend YCW's claims against Debtor. As mentioned previously, Cincinnati tried unsuccessfully to tender a defense to Debtor on at least three occasions in Adversary Proceeding 09-00018. It was not unreasonable for Cincinnati to reject YCW's attempt to tender a claim when Debtor had, through her silence, made it clear that she did not want Cincinnati to defend her for the claims asserted in Adversary Proceeding 09-00018.

In this same vein, Plaintiffs' counsel argued during the second day of trial that Yellowstone Development transferred assets to third parties so that options could not be recorded. Counsel contends such transfers are clearly within the scope of YMC's January 30, 2009, letter. The problem with counsel's foregoing argument is that it was Blixseth, and not Debtor, who transferred the Chateau de Farcheville to Danika and the St. Andrews property to St. Andrews Golf Club International. Debtor never once changed the ownership structure of either Chateau de Farcheville or St. Andrews. Debtor merely failed to record the Five Party Agreement, arguably because she may not have known that the Five Party Agreement existed until much later.

Finally, in its pleadings and at trial, YCW maintained that its claim against Debtor had three components: the loans allegedly made by YCW, the option and the right of use. As set forth in the proof of claim summaries attached to Amsden's February 3, 2010, letter, the claims at issue are a "contingent breach of fiduciary duty claim in the amount of $60,710,568 and a contingent indemnity claim in the amount of $41,773,830. Putting aside the fact that YCW identifies its claims, in the first instance, as "contingent," the full summary of the latter claim is

43

that "as a result of the Debtor's conduct, claims have been made against YCW in the amount of $41,773,830. These are claims that, in equity, should be paid by the Debtor or others. Based on interviews with former employees and review of depositions transcripts as well as of billing and financial documents, the Debtor managed the affairs of YCW. The Debtor exercised control over the YCW bank accounts. The Debtor owed fiduciary duties to YCW to prudently manage YCW's financial and legal affairs." The foregoing summary clearly identifies Debtors' failure to fulfill her fiduciary obligations to YCW. Plaintiffs concede YCW is not a named insured and Debtor's failure to act on behalf of YCW is not a matter for which coverage is available under the Policy.

As for the former claim, $20,339,511.34 of the $60,710,568 claim is attributable to Farcheville and St. Andrews.[11] The balance of the $60,710,568 pertains to Tamarindo and Turks & Caicos and again, the claims asserted against Debtor did not involve any alleged unauthorized transfers. In sum, nothing in Amsden's February 3, 2010, letter or the attachments thereto even potentially implicate coverage under Sekits' January 30, 2009, notice of wrongful acts letter.

The Court specifically inquired of the Plaintiffs at trial as to how a failure to do something, as alleged in Amsden's February 3, 2010, letter, could fit within the January 30, 2009, notice of wrongful acts letter, which identified only "unauthorized transfers" as the

_____

[11] The claim of $60,710,568 is based upon a 15 year option and right-of-use. However, the only evidence in the record shows a 10 year option and right-of-use. Based upon a 10 year option and right-of-use, the claim relating to Farcheville and St. Andrews is $18,774,488.68, with the balance of the claim attributable to Tamarindo and Turks and Caicos. Additionally, the $18,774,488.68 valuation was based on the amount Blixseth paid for the properties in 2006. Plaintiffs provided no credible evidence as to the value of St. Andrews and Farcheville in August 2008, when Debtor received YD. However, the evidence suggests that the value of St. Andrews and Farcheville were substantially below their original purchase prices by that time and indeed, both properties were in financial jeopardy.

wrongful acts.   In response to the Court's concern, counsel for Plaintiffs responded:

> Judge, let me see if I can cut to the chase in two ways. Yes, we intend to offer more evidence on it. Number 1, first of all, there's still an issue, even if that were true, of what the responsibility is of a claims handler when he has these documents to make one of three decisions: Deny coverage, cover, or provide a reservation of rights and take some other remedial step.   And that's an issue that's kind of independent of the coverage issue because that alone can establish, in our position, under Montana law, responsibility by Cincinnati.

> More importantly here, though, the transfer from Yellowstone Development is taking Credit Suisse money out of Yellowstone Development and using it inconsistent with the five-party agreement, No. 1; and, No. 2, Yellowstone Development transferring assets to third parties so that options could not be recorded. And so those acts described in the five-party agreement are precisely transfers from Yellowstone Development to fit the January 30 letter.

* * *

[W]e are also alleging coverage by virtue of Section 108(b) of the bankruptcy code, and that too will be developed later today. So that, that is another independent basis that does not need the January 30th letter, in our opinion.

Montana law is well-settled on the issue of duty to defend:

[A]n insurer's duty to defend its insured arises when an insured sets forth facts which represent a risk covered by the terms of an insurance policy.  *Lindsay Drill. & Cont. v. U.S. Fid. & Guar. Co.* (1984), 208 Mont. 91, 94, 676 P.2d 203, 205; *Graber v. State Farm* (1990), 244 Mont. 265, 270, 797 P.2d 214, 217 ("[t]he general rule is that the insurer has a duty to defend when a complaint filed against its insured sets forth facts which bring the event within the policy provisions"); *Grindheim v. Safeco Ins. Co.* (D.Mont.1995), 908 F.Supp. 794, 798 ("an insurer's duty to defend its insured arises when the insurer, through reference to pleadings, discovery, or final issues declared ready for trial, has received notice of facts representing a risk covered by the terms of the policy"). The insurance company must look to the allegations of a complaint to determine if coverage exists under an insurance policy, thus giving rise to the insurer's duty to defend. *Graber*, 244 Mont. at 270, 797 P.2d at 217. Montana "case law clearly provides that where the insurer refuses to defend a claim and does so unjustifiably, that insurer becomes liable for defense costs and judgments." *Lee v. USAA Cas. Ins. Co.*, 2004 MT 54, ¶ 19, 320 Mont. 174, ¶ 19, 86 P.3d 562, ¶ 19; *Independent Milk & Cream Co. v. Aetna Life Ins. Co.* (1923), 68 Mont. 152, 158–59, 216 P. 1109, 1111 (in interpreting agreements of indemnity, the court relied on § 8169, RCM (1921)

45

which is now codified in § 28–11–316, MCA); *Grindheim*, 908 F.Supp. at 798.

      The duty to defend is independent from and broader than the duty to indemnify created by the same insurance contract. *St. Paul Fire & Marine Ins. Co. v. Thompson* (1967), 150 Mont. 182, 188, 433 P.2d 795, 799; *Grindheim*, 908 F.Supp. at 800. The duty to defend arises when a complaint against an insured alleges facts, which if proven, would result in coverage. *St. Paul Fire & Marine Ins. Co.*, 150 Mont. at 188, 433 P.2d at 799; *Grindheim*, 908 F.Supp. at 800. "Where a complaint alleges facts which represent a risk outside the coverage of the policy but also avers facts which, if proved, represent a risk covered, the insurer is under a duty to defend." *Atcheson v. Safeco Insurance Co.* (1974), 165 Mont. 239, 245–46, 527 P.2d 549, 552 (citations omitted).

      The fundamental protective purpose of an insurance policy and the obligation of the insurer to provide a defense require that coverage exclusions be narrowly construed. *Farmers Union Mut. Ins. Co. v. Oakland* (1992), 251 Mont. 352, 356, 825 P.2d 554, 556; *Grindheim*, 908 F.Supp. at 801. The insurer is under a duty to construe the factual assertions from the perspective of the insured rather than solely from the insurer's own perspective. *Portal Pipe v. Stonewall* (1993), 256 Mont. 211, 216, 845 P.2d 746, 749; *Grindheim*, 908 F.Supp. at 801. When a court compares allegations of liability advanced in a complaint with policy language to determine whether the insurer's obligation to defend was "triggered," a court must liberally construe allegations in a complaint so that all doubts about the meaning of the allegations are resolved in favor of finding that the obligation to defend was activated. *See Portal Pipe*, 256 Mont. at 216, 845 P.2d at 749; *Grindheim*, 908 F.Supp. at 805. Unless there exists an unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage, an insurer has a duty to defend. *Insured Titles, Inc. v. McDonald* (1996), 275 Mont. 111, 116, 911 P.2d 209, 212.

*Farmers Union Mut. Ins. Co. v. Staples*, 90 P.3d 381 (Mont. 2004).

     As explained earlier, the narrow issue presented by the facts in this case is whether YCW's claims against Debtor for failure to act could in any way be covered by YMC's notice of unauthorized transfers.  Based upon well-settled law, the Court finds that they could not.

     For the reasons stated above, Plaintiffs' claims under MCA § 33-18-201 also fail as does the Plaintiffs' claim that Cincinnati breached its duty of good faith and fair dealing.  Plaintiffs have failed to show that Cincinnati violated Montana law imposing a duty of good faith and fair

dealing to third party claimants. Furthermore, Montana's Unfair Trade Practices Act provides no remedy for violations of §§ 33-18-201(2) and (14).

This leaves remaining the Plaintiffs' contention that Cincinnati violated the automatic stay. Plaintiffs fail to articulate whether they think the Policy itself is property of Debtor's bankruptcy estate or whether the proceeds of the Policy are property of Debtor's bankruptcy estate. In *In re Spaulding Composites Co., Inc.*, 207 B.R. 899 (9th Cir. BAP 1997), the Bankruptcy Appellate Panel concluded that certain insurance policies themselves were property of the estate but that the proceeds were not. The Court thinks Plaintiffs' contention is that the proceeds, and not the Policy, are property of Debtor's bankruptcy estate. In order to tap into the Policy proceeds, it would be incumbent upon YCW to first seek relief from the automatic stay, which it did not do until after the Policy limits were exhausted and until after it had settled its claim against Debtor's bankruptcy estate.

Putting aside the obvious fact that YCW did not timely secure relief from the automatic stay, in the case of competing covered claims, the Court would arguably look to the Policy to determine the interests of the bankruptcy insured and the non-bankrupt insured. The conundrum presented in the case *sub judice* was articulated by one court this way, "... satisfaction of the insurance companies' duty to pay claims brought against non-debtor co-insureds, including satisfaction of the defense costs being incurred by the co-insureds, will render it impossible to satisfy the claims ... held by the debtors [with proceeds of the insurance]." *In re Metropolitan Mortg. & Securities, Co., Inc*., 325 B.R. 851, 856 (Bankr. E.D. Wa. 2005). In this case, while Blixseth has, with this Court's permission, exhausted the Policy limits, the issues attendant to competing claims is not implicated here because Plaintiffs have not shown that Debtor has or had

a covered claim that she could assert against the Policy.  The Policy had a set term that expired

January 31, 2009.  The only way Debtor could assert a claim under the Policy at this late date is if

she had a claim that arose out of the unauthorized transfers referenced in Sekits' January 30,

2009, letter.  Seeing no such claims, the Court finds that Cincinnati did not violate the automatic

stay in Debtor's bankruptcy case when it defended Blixseth in various proceedings and exhausted

the Policy limits, after seeking and obtaining relief from the automatic stay in the Yellowstone

Club entities' bankruptcy cases.

   For the reasons discussed above,

    IT IS ORDERED that the Court will enter a separate judgment in favor of the Defendant,

Cincinnati Insurance Company, and against the Plaintiffs, Ross P. Richardson and Richard J.

Samson; and the Plaintiffs' complaint against the Defendant is dismissed with prejudice.

    IT IS FURTHER ORDERED that Cincinnati's Motion in Limine to Preclude Evidence of

Attorneys' Fees Damages filed November 1, 2011, at docket entry no. 112, Cincinnati's Motion

in Limine to Preclude Evidence Relating to Estoppel filed November 1, 2011, at docket entry no.

113, and Cincinnati's Motion for Partial Summary Judgment filed November 1, 2011, at docket

entry no. 115, are denied as moot.

    IT IS FURTHER ORDERED that Samson's Request for Judicial Notice filed January 6,

2012, at docket entry no. 191 is denied as tardily filed.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

48